IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| WELLS FARGO EQUIPMENT FINANCE, INC., | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Civil Case No.: 1:10-cv-1246 ) |
| STATE FARM FIRE AND CASUALTY COMPANY, et al., | ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION

On November 2, 2010, Plaintiff Wells Fargo Equipment Finance, Inc. ("Wells Fargo") initiated a breach of contract action against five defendants. The matter now comes before this Court on Wells Fargo's Motion for Judgment against two of those defendants, State Farm Fire and Casualty Company ("State Farm Fire") and State Farm Mutual Automobile Insurance Company ("State Farm Auto") (collectively "State Farm"). The parties have fully briefed and argued the Motion, and the matter is ripe for disposition. For reasons set forth below, this Court grants Wells Fargo's Motion for Judgment.

*Jurisdiction and Venue*

Wells Fargo is a Minnesota corporation that maintains its principal place of business in Minneapolis, Minnesota. State Farm Fire and State Farm Auto are Illinois corporations with their principal places of business in Bloomington, Illinois. All three corporations are authorized to conduct business in the Commonwealth of Virginia.

Defendant RODO, Inc. ("RODO") is a Virginia corporation with its principal place of business in Loudon County, Virginia. Defendant Miriam Trucking ("Miriam Trucking") was at

all times relevant a Virginia corporation with its principal place of business in Loudon County, Virginia. Defendant Rodolfo Tekle is a resident and citizen of the Commonwealth of Virginia.

The amount in controversy, exclusive of interest and costs, exceeds $75,000, and complete diversity exists between Wells Fargo and Defendants. The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332. Venue is proper pursuant to 28 U.S.C. § 1391.

*Factual Background*

The undisputed facts are as follows. In April 2008, Wells Fargo loaned RODO $265,318.00 for the purchase of two 2006 Peterbilt Trucks, Model 378, with vehicle identification numbers ending in 182 ("Truck 182") and 186 ("Truck 186"). Am. Compl. ¶ 14; Answer ¶ 14. The following month, Wells Fargo loaned RODO $79,318.00 to finance the purchase of one 2005 Peterbilt Truck, Model 378, with a vehicle identification number ending in 923 ("Truck 923"). Am. Compl. ¶ 14; Answer ¶ 14. Pursuant to two loan contracts, RODO granted Wells Fargo a security interest in the three trucks. Am. Compl. ¶ 15; Answer ¶ 15. RODO assigned the loan contracts and the trucks to Miriam Trucking on July 17, 2008. Am. Compl. ¶ 17; Answer ¶ 17.

In August 2008, State Farm Fire issued an insurance policy to Miriam Trucking covering Trucks 182 and 186 during the coverage period of August 5, 2008 through March 1, 2009 ("State Farm Fire Policy"). Am. Compl. ¶ 18; Answer ¶ 18. The State Farm Fire Policy named Wells Fargo as loss payee with respect to both trucks. Am. Compl. ¶ 18; Answer ¶ 18. The same month, State Farm Auto issued an insurance policy to Miriam Trucking covering Truck 923 from August 13, 2008 through January 19, 2009 ("State Farm Auto Policy"). Am. Compl. ¶ 19;

Answer ¶ 19. The State Farm Auto Policy named Wells Fargo as loss payee with respect to Truck 923.

On December 13, 2008, a fire destroyed Truck 186 and Truck 923. Am. Compl. ¶ 20; Answer ¶ 20. Wells Fargo, acting as loss payee under the two policies, filed claims with State Farm. State Farm refused to pay Wells Fargo's claims, and Wells Fargo brought suit in this Court. Wells Fargo now seeks judgment on the first two counts of its Amended Complaint. In Count I, Wells Fargo alleges that State Farm Fire's failure to provide coverage for Wells Fargo's loss of Truck 186 constitutes a breach of contract. In Count II, Wells Fargo alleges that State Farm Auto's failure to cover the loss of Truck 923 likewise constitutes a breach of contract.

*Applicable Law*

1. Judgment on the Pleadings

After the pleadings close, a party may move for judgment on the pleadings. FED. R. CIV. P. 12(c). "A Rule 12(c) motion for judgment on the pleadings is appropriate when all material allegations of fact are admitted in the pleadings and only questions of law remain." *Republic Ins. Co. v. Culbertson*, 717 F. Supp. 415, 418 (E.D. Va. 1989); *see also King v. Gemini Food Servs., Inc.*, 438 F. Supp. 964, 966 (E.D. Va. 1976) (judgment on the pleadings appropriate where no genuine issues of material fact remain and the case can be decided as a matter of law). In the present matter, no issues of material fact exist to necessitate trial. Rather, the only contested issue is whether the relevant insurance policies obligate State Farm to pay Wells Fargo for the loss of the damaged trucks. The interpretation of an insurance policy presents a question of law "well suited for resolution by the court." *St. Paul Fire and Marine Ins. Co. v. Jacobson*, 826 F. Supp. 155, 157 (E.D. Va. 1993); *see also Plunkett v. Plunkett*, 624 S.E.2d 39, 41 (Va. 2006) ("The question whether contract language is ambiguous is one of law, not fact.").

2. Contract Interpretation

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, so it must apply state law in interpreting the relevant contract provisions. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). To determine which state's laws should apply, the Court applies the choice-of-law rules of the Commonwealth of Virginia. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "Under Virginia law, a contract is made when the last act to complete it is performed, and in the context of an insurance policy, the last act is the delivery of the policy to the insured." *Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*, 377 F.3d 408, 419 (4th Cir. 2004); *Buchanan v. Doe*, 431 S.E.2d 289, 291 (Va. 1993) ("generally, the law of the place where an insurance contract is written and delivered controls issues as to its coverage"). The policies in the present case were delivered to defendants located in Virginia. Therefore, Virginia contract law will govern this Court's interpretation of the insurance policy between Wells Fargo and State Farm.

Virginia law treats insurance policies as any other contract. To determine the intent of the contracting parties, the court must consider the words the parties have used in the instrument. *Virginia Farm Bureau Mut. Ins. Co. v. Williams*, 677 S.E.2d 299, 302 (Va. 2009). These words are assigned their "ordinary and customary meaning when they are susceptible of such construction." *Hill v. State Farm Mut. Auto. Ins. Co.*, 375 S.E.2d 727, 729 (Va. 1989). "Provisions of an insurance policy must be considered and construed together, and any internal conflicts between provisions must be harmonized, if reasonably possible, to effectuate the parties' intent." *Williams*, 677 S.E.2d at 302.

Where the terms of a policy are "plain and clear and not in violation of law or inconsistent with public policy," a court is "bound to adhere to [them]." *Pilot Life Ins. Co. v.*

4

*Crosswhite*, 145 S.E.2d 143, 146 (Va. 1965); *see also P'ship Umbrella, Inc. v. Fed. Ins. Co.*, 530 S.E.2d 154, 160 (Va. 2000) ("when the language in an insurance policy is clear and unambiguous, courts do not employ rules of construction; rather, they give the language its plain and ordinary meaning and enforce the policy as written"). If, however, "disputed policy language is ambiguous and can be understood to have more than one meaning," the court must "construe the language in favor of coverage and against the insurer." *Williams*, 677 S.E.2d at 302; *see also United Serv. Auto. Ass'n v. Pinkard*, 356 F.2d 35, 37 (4th Cir. 1966) ("The text writers and the cases from the appellate courts of nearly all of the states accentuate the rule that ambiguous and doubtful language must be interpreted most strongly against the insurer.") (quoting *Ayres v. Harleysville Mut. Cas. Co.*, 2 S.E.2d 303, 305 (Va. 1939)); *Hill*, 375 S.E.2d at 730 ("Because insurance carriers select the language of the policies they write, any doubt concerning the meaning of the policy language is resolved against the insurer."). "Where two interpretations equally fair may be made, the one which permits a greater indemnity will prevail because indemnity is the ultimate object of insurance." *Cent. Sur. & Ins. Corp. v. Elder*, 129 S.E.2d 651, 655 (Va. 1963).

Policy language that purports to exclude specific events from coverage is "construed *most strongly* against the insurer." *St. Paul Fire & Marine Ins. Co. v. S.L. Nusbaum & Co., Inc.*, 316 S.E.2d 734, 736 (Va. 1984) (emphasis added); *see also Pinkard*, 356 F.2d at 37 ("insurance policies are to be liberally construed in favor of the assured and exceptions and exclusions are to be strictly construed against the insurer") (quoting *Ayres*, 2 S.E.2d at 305); *Williams*, 677 S.E.2d at 302 ("Because insurance policies usually are drafted by insurers, we construe ambiguous policy language purporting to exclude certain occurrences from coverage most strongly against the insurer."). For this reason, an insurer seeking to limit coverage through an exclusion must

use language that is "reasonable, clear, and unambiguous." *Id.; see also Floyd v. N. Neck Ins. Co.*, 427 S.E.2d 193, 196 (Va. 1993) (courts may enforce exclusions from coverage only where the exclusions "clearly and unambiguously bring the particular act or omission within its scope"); *Virginia Elec. & Power Co. v. Northbrook Prop. & Cas. Ins. Co.*, 475 S.E.2d 264, 266 (Va. 1996) ("Exclusionary language in an insurance policy is to be construed most strongly against the insurer, and the burden is upon the insurer to prove that an exclusion applies.").

*Discussion*

At the center of the dispute between State Farm and Wells Fargo is language contained in both policies' "Loss Payable Endorsement" (the "Endorsement"). The Endorsement provides, in pertinent part, as follows:

> With respect to coverage provided by this endorsement, the provisions of the coverage form apply unless modified by the endorsement.
>
> (a) We will pay, as interest may appear, you and the loss payee named in the policy for "loss" to a covered "auto."
>
> (b) The insurance covers the interest of the loss payee unless the "loss" results from conversion, secretion or embezzlement on your part.

Am. Compl., Ex. E-1, State Farm Fire Policy 36; Am. Compl. Ex. E-2, State Farm Auto Policy 22. The first clause of the Endorsement simply provides that the loss payee, Wells Fargo, is entitled to the same coverage as the insured party, Miriam Trucking, for "loss" to the covered vehicles. The policies define "loss" as "direct and accidental loss or damage." State Farm Fire Policy 32; State Farm Auto Policy 18.

The second clause ("Clause B") of the Endorsement provides that, in addition to the standard insurance coverage, the interest of Wells Fargo is covered unless the loss results from conversion, secretion, or embezzlement on Miriam Trucking's part. Wells Fargo contends that

6

Clause B functions as a "standard mortgage" or "union mortgage" clause, entitling them to recovery irrespective of Miriam Trucking's acts or omissions.

The standard mortgage clause is best understood by reference to its predecessor: the open mortgage clause. An open mortgage clause typically provides that loss, if any, be payable to the mortgagee, "as his interest may appear." *Syndicate Ins. Co. v. Bohn*, 65 F. 165, 173 (8th Cir. 1894). In effect, the clause directs an insurer to pay policy proceeds to the lienholder before paying proceeds to the insured party. *Foremost Ins. Co. v. Allstate Ins. Co.*, 486 N.W.2d 600, 602 (Mich. 1992). The lienholder is an appointee of the mortgagor, and his right to recover under the policy is coterminous with that of the insured. *Id.*; *Syndicate*, 65 F. at 173. The problem with this arrangement, from the perspective of mortgagees, is that indemnity is precarious—"liable to be destroyed by the ignorance, carelessness, or fraud of the mortgagors." *Syndicate*, 65 F. at 173

Standard mortgage clauses began to appear over a century ago in order to address this deficiency. In *Hastings v. Westchester Fire Ins. Co.*, the New York Court of Appeals considered language annexed to an open mortgage clause stating, "[i]t is hereby specially agreed that this insurance, as to the interest of the mortgagee . . . , shall not be invalidated by any act or neglect of the mortgagor or owner of the property insured . . . ." 73 N.Y. 141, 143 (1878). Judge Rapallo's concurrence explained the purpose behind the addition:

> "I think the intent of the clause was to make the policy operate as an insurance of the mortgagors and the mortgagees separately, and to give the mortgagees the same benefit as if they had taken out a separate policy, free from the conditions imposed upon the owners, making the mortgagees responsible only for their own acts . . . . This provision, in case the policy were invalidated as to the mortgagors, made it, in substance, an insurance solely of the interest of the mortgagees, by direct contract with them, unaffected by any questions which might exist between the company and the mortgagors."

7

*Id.* at 154. The Virginia Supreme Court echoed this interpretation in *New Brunswick Fire Insurance Co. v. Morris Plan Bank*, observing that the standard mortgage clause "acts as a separate and independent insurance of the mortgagee's interest," and "that no act or omission on the part of the owner which occurs after the issuance of the policy shall affect the mortgagee's right to recover." 118 S.E. 236, 237-238 (Va. 1923); *Provident Fire Ins. Co. v. Union Trust Corp.*, 78 S.E.2d 584, 586 (1953). Modern legal authorities substantially agree that a standard mortgage clause constitutes an independent contract between insurer and lienholder, which cannot be negated by the wrongful or negligent acts of the insured party. *National Bank of Fredericksburg v. Virginia Farm Bureau Fire and Cas. Ins. Co.*, 606 S.E.2d 832, 834 (Va. 2005); *see also Gibraltar Fin. Corp. v. Lumbermens Mut. Cas. Co.*, 513 N.E.2d 681, 682 (Mass. 1987) ("To better secure lenders . . . , the open mortgage clause more recently is customarily modified to provide that the lender's coverage could not be forfeited by the act or default of any other person."); 4 LEE R. RUSS & THOMAS F. SEGALA, COUCH ON INSURANCE § 65:32 (3d ed. 2010) ("Where the policy contains this form of mortgage clause, the mortgagee has an independent contract with the insurer which cannot be defeated by improper or negligent acts of the mortgagor."). Moreover, Virginia law makes clear that, where a standard mortgage clause is in effect, an act of intentional arson by an insured does not defeat recovery by the lienholder from the insurer. *See Wagner v. Peters*, 128 S.E. 445, 446 (Va. 1925) (holding that insurer may be liable to creditor under mortgage clause where owners of property destroyed property by arson).

The value to lenders of a standard mortgage clause is manifest. By requiring borrowers to obtain an insurance policy that includes a standard mortgage clause, the lender protects its interests against defenses that an insurer could raise against a negligent, or even arsonist,

8

borrower. *Foremost*, 486 N.W.2d at 603. The incorporation of the clause assures the lender that it will not be required to assess a borrower's insurance claim history when considering whether to extend a loan. *Id.*

In oral argument, State Farm argued that the term "loss," as it appears in Clause B, imports the policy definition of "loss," i.e., "direct and accidental loss or damage." *See also* Answer ¶ 45 ("State Farm Fire and State Farm Auto deny that there was an accidental occurrence for which coverage is afforded by the policies."). State Farm apparently contends that because the policy definition does not include *intentional* loss or damage, Clause B does not cover Wells Fargo in the event of arson by the borrower. This proposed construction raises several problems. First, such an interpretation disregards the historical function and scope of the standard mortgage cause. Moreover, it renders the clause's inclusion of a bar to recovery in the event of "conversion, secretion, or embezzlement" redundant and meaningless. *See Daugherty v. Diment*, 385 S.E.2d 572, 574 (Va. 1989) ("In construing the documents as a whole, the court will not treat any word or clause as meaningless if any reasonable interpretation consistent with the other portions of the contract can be ascribed to it."). If a lienholder could recover only in the event of an accidental loss, the clause would not need to exclude coverage for conversion, secretion, or embezzlement, all of which require intent on the part of the perpetrator. *Gibraltar*, 513 N.E.2d at 682; *Foremost*, 486 N.W.2d at 603-4.

Even if this Court imported into the standard mortgage clause the policy definition of "loss," State Farm would not necessarily prevail. "Direct or accidental loss or damage" means that the loss must be accidental from the perspective of the insured parties. If the policies required that the loss be accidental from the perspective of *everyone*, then acts of intentional

9

destruction or theft committed by third parties would not come within the bounds of coverage. *Foremost*, 486 N.W.2d at 608 (Brickley, J., concurring).

As previously noted, Virginia courts read standard mortgage clauses as creating an independent contract between insurer and lienholder. *National Bank*, 606 S.E.2d at 834. One implication of this interpretation is that Wells Fargo, as lienholder, is as much an *insured* party under the policies as Miriam Trucking. It would seem unreasonable to construe the policy such that one insured's hope for recovery turns on whether a loss was accidental from the perspective of another. An equally if not more plausible interpretation of "direct and accidental loss or damage" would read the language to mean accidental from the perspective of the insured party making the claim. *Foremost*, 486 N.W.2d at 609 (Brickley, J., concurring). State Farm does not allege that the destruction of Trucks 186 and 923 was anything but accidental from Wells Fargo's perspective. Therefore, the policy definition of "loss" would not preclude Wells Fargo from recovery.

The rules of contract interpretation and the historical function of standard mortgage clauses do not favor the construction of Clause B proposed by State Farm. The disputed language is, at best, ambiguous, and the Court must therefore construe the clause in favor of coverage. *Williams*, 677 S.E.2d at 302. This Court therefore interprets the provision at issue to cover the interests of Wells Fargo under the present circumstances, barring any applicable exclusions.

State Farm next contends that Miriam Trucking's alleged arson qualifies as "conversion," and that Clause B's exclusionary language therefore precludes Wells Fargo from recovery. *See* Answer ¶ 46 ("the subject vehicles were destroyed by fire as a result of conversion, secretion, or embezzlement and [State Farm's] denial of Wells Fargo's claim under the standard mortgage

clauses in their policies is proper."). As previously stated, an insurer seeking to limit coverage through an exclusion must use language that is "reasonable, clear, and unambiguous," *Williams*, 677 S.E.2d at 302, with any doubts resolved in favor of the insured. *Hill*, 375 S.E.2d at 730. Having considered the language of the policy, and legal authority in Virginia and elsewhere, this Court concludes that "conversion," as that term appears in Clause B, does not clearly and unambiguously encompass acts of arson by the insured.

Virginia law defines "conversion" as "the wrongful exercise or assumption of authority over another's goods, depriving the owner of their possession, or any act of dominion wrongfully exerted over property in denial of, or inconsistent with, the owner's rights." *Simmons v. Miller*, 544 S.E.2d 666, 679 (Va. 2001). To maintain an action for conversion, a plaintiff must be entitled to the immediate possession of the thing alleged to have been converted. *United Leasing Corp. v. Thrift Ins. Corp.*, 440 S.E.2d 902, 906 (Va. 1994); *Mullins v. Sutherland*, 109 S.E. 420, 423 (1921). The tort of conversion may lie where intangible property rights alleged to have been converted "arise from or are merged with a document, such as a . . . promissory note, or bond." *United Leasing Corp.*, 440 S.E.2d at 906 (citing RESTATEMENT (SECOND) OF TORTS § 242 and cmt. e (1965)). The Virginia Courts have not addressed whether an owner's intentional destruction of a vehicle constitutes conversion, where that vehicle is subject to a third party lien.

Turning to the policies themselves, the language used by State Farm does not make clear that arson by the insured qualifies as "conversion." The policies offer no definition of "conversion," and the Endorsement makes reference to neither arson nor intentional destruction. Moreover, one can fairly read "conversion" in Clause B as referring to either conversion of the insured vehicles or as referring to the conversion of the lienholder's interest in those vehicles. In oral argument, counsel for State Farm contended that her client prevails under either

interpretation. The Court disagrees. Nothing in the record indicates that Wells Fargo was entitled to the possession of the trucks at the time of their destruction, and Miriam Trucking could not legally convert its own property. *See Commonwealth v. Baker*, 16 Va. Cir. 183 (Va. Cir. Ct. 1989) ("It is self-evident that one cannot convert one's own property in the tortious sense of the word, since conversion implies an unauthorized or unlawful exercise of dominion over the property of another."). Therefore, if one interprets "conversion" to refer to conversion of the insured vehicles, the exclusion would not apply. *See Gibraltar*, 513 N.E.2d at 683 (holding that conversion exclusion in loss payable clause did not bar recovery by lienholder where lienholder did not have immediate right to possess vehicle intentionally destroyed by owner).

Even if the Court assumes that the term "conversion" in Clause B refers to conversion of the lienholder's interest, Wells Fargo would still be entitled to recovery. Concededly, were this Court to construe "conversion" in its broadest sense, an intentional act of arson that diminishes a lienholder's interest could come within that definition.[1] Virginia law is insistent, however, that where exclusionary language is ambiguous, a court must interpret that language strictly, with all doubts resolved in favor of coverage for the insured. *Pinkard*, 356 F.2d at 37.

A strict reading of the exclusionary language in Clause B does not support State Farm's position. As previous courts have observed, the terms "conversion," "embezzlement," and "secretion" connote theft or larceny. *Foremost*, 486 N.W.2d at 610 (Brickley, J., concurring); *Nat'l Cas. Co. v. Gen. Motors Acceptance Corp.*, 161 So.2d 848, 852 (Fla. Dist. Ct. App. 1964)

---

[1] An Illinois appellate court has held that the conversion exclusion applies under circumstances similar to those presently before this Court. In *Commerce Union Bank v. Midland National Insurance Co.*, the Court stated simply that it was "difficult to conclude that either a complete consumption of an article if it is consumable, or its intention[al] destruction, would be covered by a policy which excluded liability for 'conversion.'" 193 N.E.2d 230, 232 (Ill. App. Ct. 1963). Respectfully, *Commerce Union* lacks any detailed analysis of the conversion exclusion, and this Court accords it little persuasive weight.

("We are satisfied that the defendant insurer, in using the word 'conversion' in connection with the words 'embezzlement and secretion' had reference to conversion in the criminal sense rather than as a tort."). Therefore, under a strict construction, the conversion proviso acts only as a limit upon the policy's theft coverage—excluding recovery by the secured party where the buyer absconds with the automobile.

This narrower interpretation accommodates what courts and commentators have explained as the purpose behind conversion exclusions in standard mortgage clauses. In the absence of such exclusions, a secured lender could assert a claim against the insurer whenever a borrower could not afford a monthly payment and either kept the car illegally or removed the vehicle from the reach of the lienholder. Neil J. Lehto, *The Standard Mortgage Clause Under Attack: The Lender's Insurance Claim When a Borrower Commits Arson*, 66 U. DET. L. REV. 603, 614-15 (1989); WILLIAM H. RODDA, PROPERTY AND LIABILITY INSURANCE 329 (1966). The exclusion ensures that the lienholder retains the risk that a borrower might be a credit hazard, while protecting his interests in the event of actual loss of, or damage to the automobile for which the lienholder obtained insurance. *Foremost*, 486 N.W.2d at 610 (Brickley, J., concurring); *see also Fiske v. Niagara Fire. Ins. Co.*, 278 P. 861, 862 (Cal. 1929) (holding that conversion exclusion applied where buyer tendered bad check and absconded with insured vehicle); *Progressive Am. Ins. Co. v. Florida Bank at Daytona*, 452 So.2d 42, 44-45 (Fla. Dist. Ct. App. 1984) (holding that conversion exception applied where owner reported insured vehicle stolen and was later found to have been involved in its theft).[2]

---

[2] The Virginia Supreme Court's decision in *Universal CIT Credit Corp. v. Kaplan*, 92 S.E.2d 359 (Va. 1956), cited by State Farm, is not to the contrary. In *Kaplan*, an individual named Bailey purchased a car under a conditional sales contract. *Id.* at 360. Under the terms of the contract, title to the car was reserved in the Plaintiff pending payment by Bailey of the total purchase price. *Id.* Bailey defaulted, erased the Plaintiff's name from the certificate of title, and sold the car to a third party. *Id.* at 361. The Court held that since Bailey was in default, and had no right

In concluding, this Court notes that should State Farm wish to avoid liability to lenders where insured borrowers intentionally destroy their vehicles by arson, it should endeavor to add "arson" to the list of owner acts excepted from coverage. *Foremost*, 486 N.W.2d at 607 n.34; *Gibraltar*, 513 N.E.2d at 683. State Farm claimed in oral argument that such additional language was superfluous because arson plainly falls within the definition of "conversion." *See also* State Farm Mem. in Opp'n 3 ("State Farm submits that the language of the loss payee clause is not ambiguous."). Given the number of decisions in which courts have rejected State Farm's proposed construction, such a position is simply untenable. *See Foremost*, 486 N.W.2d at 606 (holding that owner could not "convert" own property and that conversion exclusion did not therefore apply); *Gibraltar*, 513 N.E.2d at 683 (holding that burning of vehicle by owner did not constitute conversion); *Bennett Motor Co. v. Lyon*, 380 P.2d 69, 71 (Utah 1963) (holding that owner's intentional destruction of vehicle was "direct and accidental" from perspective of lienholder such that lienholder could recover as loss payee); *Nationwide Mut. Ins. Co. v. Dempsey*, 495 S.E.2d 914, 916 (N.C. Ct. App. 1998) (observing that "[d]estruction differs from . . . conversion in that it is permanent and the loss payee is left without remedy to recover its loss," and holding that conversion exception did not apply); *Pittsburgh Nat'l Bank v. Motorists Mut. Ins. Co.*, 621 N.E.2d 875, 879 (Ohio Ct. App. 1993) (holding that use of "conversion" in loss payable clause was ambiguous, and that exclusion did not include intentional burning of automobile by insured); *National Cas. Co.*, 161 So.2d at 852 (interpreting "conversion" in

---

to sell the car, his actions exercised dominion over the property inconsistent with Plaintiff's rights and constituted conversion. *Id.* at 365. In *Kaplan*, as in *Foremost*, *Fiske*, and *Progressive*, "the lienholder's inability to enforce its security interest result[ed] from a credit problem rather than a risk of loss or damage to the property for which the lienholder obtained insurance." *Foremost Ins. Co. v. Allstate Ins. Co.*, 486 N.W.2d 600, 610 (Mich. 1992) (Brickley, J., concurring). Thus, Bailey's actions qualify as "conversion" under a strict interpretation of the conversion exclusion.

exclusion as referring to conversion in criminal rather than tortious sense, and holding that exclusion did not apply). State Farm has included language in its policies that courts have repeatedly held subject to more than one interpretation. State Farm may not now take advantage of that ambiguity to deny coverage. *See id.* ("An insurer will not be allowed by the use of obscure phrases or exceptions to defeat the purpose for which the policy was procured . . . .").

*Conclusion*

The term "conversion" in the loss payable clause is ambiguous. State Farm's proposed construction of that term is contrary to Virginia rules of construction, contrary to the historical intent of standard mortgage clauses and conversion exclusions, and contrary to nearly every court decision on point. Construing the conversion exclusion strictly, this Court concludes that the exclusion does not apply to the intentional burning of the vehicles by the insured. Plaintiff Wells Fargo's Motion for Judgment is therefore granted.

Alexandria, Virginia
April 6, 2011

/s/
Liam O'Grady
United States District Judge